289 F.2d 616
 Otto HAUG, T/A Southeastern Floor Company, Plaintiff, Appellee,
v.
GERSTEN CONSTRUCTION COMPANY, Defendant, Cross-Claimant and Third-Party-Plaintiff, Appellant,
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY, Third-Party-Defendant and Cross-Claimant, Appellee.
 No. 8290.
 United States Court of Appeals Fourth Circuit.
 Argued April 4, 1961.
 Decided May 9, 1961.
 
 1
 Jacob Shearer, Beverly Hills, Cal., and John Thorpe Richards, Alexandria, Va. (Clarke, Richard, Moncure & Whitehead, Alexandria, Va., Shearer & Fields, Beverly Hills, Cal., and Bernard Shearer, Beverly Hills, Cal., on brief), for defendant-appellant, Gersten Construction Co.
 
 
 2
 Benj. W. Dulany, Washington, D. C. (Douglas, Obear & Campbell, Washington, D. C., on brief), for plaintiff-appellee, Otto Haug.
 
 
 3
 Jackson, Gray & Jackson, and John W. Jackson, Washington, D. C., on brief for third-party defendant-appellee, U. S. Fidelity and Guaranty Co.
 
 
 4
 Before SOPER and HAYNSWORTH, Circuit Judges, and HARRY E. WATKINS, District Judge.
 
 
 5
 HARRY E. WATKINS, District Judge.
 
 
 6
 This is an appeal from a judgment on a jury verdict in a contract action brought by Appellee Otto Haug, as a flooring subcontractor, against Appellant Gersten Construction Company, the general contractor, for breach of the flooring subcontract. Gersten's answer alleged that Haug had failed to comply with the terms of the subcontract and that the termination was therefore proper under the subcontract. Gersten also counter-claimed for damages suffered in recontracting the job. Gersten, in connection with the counterclaim, named Appellee United States Fidelity and Guaranty Company as a cross-defendant as surety on Haug's obligation. The jury awarded Haug $40,000 and judgment was entered on the verdict. After denial of its motions to set aside the verdict and for a new trial, Gersten effected this appeal.
 
 
 7
 The only question before this court on appeal is whether it was proper for the trial judge to submit to the jury the issue of whether Haug agreed to a work schedule furnished by Gersten. Gersten contends that a reasonable person must conclude from the evidence that Haug did so agree and that the court should not have submitted this issue to the jury. We disagree with this contention, and hold that the issue of agreement was properly submitted to the jury.
 
 
 8
 Gersten is a California corporation engaged in the general contracting business. Gersten entered into a contract with the Department of the Army for the construction of 309 duplex houses containing 618 apartment units in the vicinity of Fort Belvoir, Virginia. Pursuant to this contract, Gersten, on August 8, 1958, entered into a subcontract with Haug, doing business as Southeastern Floors, under which Haug agreed to install the flooring in the houses for a price of $248,000.
 
 
 9
 The record shows that some difficulties were experienced between the general contractor and the subcontractor from the time of inception of work under the contract. Issues arose as to whether baseboards should be installed prior to the flooring, whether weather stripping, front and back stoops, sidewalks, and grading should be completed prior to the flooring installation, and whether the flooring work was progressing at the proper speed. The mutual dissatisfaction of the parties (Gersten because of what it considered lack of satisfactory progress, and Haug because of purported onerous requirements of performance) led to a meeting between the two parties on May 27, 1959. It was at this meeting that the work schedule was discussed, and either imposed by Gersten or agreed to by Haug. Haug concedes that the schedule was never complied with.
 
 
 10
 On June 23, 1959, the contract was terminated by Gersten, seven reasons being listed in the termination letter. The only reason material here is "Failure to make progress required and failure to comply with time schedules provided for plaintiff's performance." Thus, if it could be found as a matter of law that Haug agreed to the work schedule, his failure to comply with the schedule would be a breach of contract, justifying Gersten in writing the letter of termination.
 
 
 11
 The trial judge instructed the jury that they must determine whether the work schedule was reasonable or arbitrary, and that if Haug voluntarily agreed to it, this would be conclusive evidence of the reasonableness of the schedule. Thus, the issue of agreement was left to the jury.
 
 
 12
 It would appear from the record that Gersten relied at the trial upon the theory that the written contract provided that any work schedule required by Gersten was binding on Haug. Consequently, very little was said by anyone about any separate and subsequent oral agreement by Haug that he would comply with such work schedule. The counterclaim of Gersten avers that "plaintiff failed to make the progress required of the plaintiff by the defendant and further that plaintiff failed to comply with the time schedule provided for the plaintiff's performance." (Emphasis added.) Nothing is said about any subsequent oral agreement.
 
 
 13
 Counsel for appellant, in his opening statement to the trial court, stated that Gersten gave Haug "written directions to proceed with doing so many buildings per day * * *," and that "He never approached the four or six (houses per day) which was required of him * * *." (Emphasis added.)
 
 
 14
 Most of the evidence at the trial related to the terms of the work schedule "required" of Haug in the written contract, and whether such terms were reasonable. The reasonableness of such required work schedule was appropriately submitted to the jury under proper instructions. Upon appeal Gersten now concedes that there was sufficient evidence to go to the jury as to the reasonableness of the work schedule and all other issues, except the single issue as to whether Haug agreed to the work schedule.
 
 
 15
 Appellant Gersten relies for reversal upon the testimony of John F. Keogan, project manager for Gersten, because no other witness mentions any such agreement. His testimony relates to the meeting of the two parties on May 27, 1959, and a letter sent by him to Haug on May 28, 1959. The pertinent part of the letter is as follows:
 
 
 16
 "Gentlemen:
 
 
 17
 "As a result of our meeting Thursday, May 28, we list the following: * * *
 
 
 18
 "Number Three. As per our conversation we expect, starting Monday, June 1st, that you will install floors at the rate of four (4) buildings per day and will build this installation to six (6) buildings per day by Friday, June 5th."
 
 
 19
 Due to the importance attached to Keogan's testimony by appellant, it may be well to set out his testimony relating to the meeting and letter:
 
 
 20
 "Q. Now do you recall any conversations at that meeting with regard to the schedule? A. Yes. The conversation set up that we were not getting enough production and all of our problems were brought to the Southeastern's attention. And at that time a promise was made verbally, as it had been on previous occasions, that they would step up their production. Because of the failure on their oral promises of production, I confirmed the meeting of the 27th with a registered letter to Southeastern Flooring. And as far as the production is concerned — shall I read what I confirmed?
 
 
 21
 "Q. Yes. You go ahead and read from that letter. A. As far as this covered other items, but as far as production was concerned, No. 3, as per our conversation, we expect starting Monday, June the 1st, that you will install floors at the rate of 4 buildings a day, and will build this installation to 6 buildings a day by Friday, June the 5th.
 
 
 22
 "Q. And these figures were agreed on at your meeting? A. It was confirming. Yes, definitely. It was confirmation of the meeting.
 
 
 23
 "Q. You mean this was not a unilateral action on your part, then? A. No, no, this was after a meeting held in my office on the project."
 
 
 24
 We believe that this testimony, considered with all the other evidence, can reasonably be interpreted to be consistent with the theory that the work schedule was never agreed to by Haug. Keogan's only testimony to the effect that Haug had agreed to anything at all was that Haug promised to "step up their production." This statement does not prove as a matter of law that Haug agreed to the work schedule or promised to meet the requirements set forth in the work schedule. To the question "And these figures were agreed on at your meeting?", Keogan answered: "It was confirming. Yes, definitely. It was confirmation of the meeting." Appellant would interpret the "Yes, definitely." as an answer in itself to the question of whether the figures set out in the work schedule were agreed to by Haug, but we feel that, read in context, the words could reasonably be interpreted to mean: Yes, definitely it was confirming. Thus, the letter of May 28, 1959, could well have been confirming directions given Haug by Gersten at the meeting.
 
 
 25
 The question "You mean this was not a unilateral action on your part, then?" was undoubtedly put to Keogan to achieve a response concerning the alleged agreement by Appellee Haug at the meeting on May 27, 1959. Keogan apparently misunderstood the question, for he answered "No, no, this was after a meeting held in my office on the project." Thus, his answer referred to the letter he sent to Haug on May 28, which of course was unilateral. The testimony is at best ambiguous, and subject to more than one reasonable construction.
 
 
 26
 Haug was not asked whether he agreed to this work schedule. We think he should have been interrogated on this subject; however, in view of the fact that such agreement was not mentioned in defendant's answer, cross-claim, nor by counsel in opening statements, and in view of the ambiguous reference thereto in the testimony of Keogan (the only witness to mention or refer to any such agreement), it is understandable that counsel for Haug may have thought that further interrogation on this subject was unnecessary.
 
 
 27
 Some other evidence in the record is noteworthy as tending to show that the work schedule was never agreed to by Haug. Nowhere in Keogan's letter to Haug of May 28, 1959, is the word "agreement" used. In fact, it does not appear in any of the correspondence between the two parties. The letter of May 28 states merely what "we (Gersten) expect." The dismissal letter of June 23, 1959, states in part: "You have failed to make the progress required of you. * * *" (Emphasis added.) We feel that a jury could reasonably infer from the absence of any reference to an agreement, and the use of the words "expect," and "require," that no agreement existed, and we further feel that it is a proper subject for jury determination.
 
 
 28
 There is also much evidence in the record to the effect that the work schedule was unreasonable, if not impossible of performance. Under the work schedule, Haug was required to complete 4 houses a day for 5 days beginning June 1, or a total of 20 houses. From and after June 5, he was required to complete 6 houses per day, and at this rate 94 houses would have been completed on June 22, fourteen weeks prior to acceptance and settlement, and twenty-two weeks prior to the contract completion date. General Floors, Haug's successor, never met the schedule, but maintained about the same rate of completion that Haug maintained during the last twelve working days prior to his dismissal. The jury may have reasonably inferred from this evidence that a man with experience in the flooring business would never have agreed to such a work schedule.
 
 
 29
 Before being dismissed from the project, Haug completed 37 buildings and partially completed others at a total out-of-pocket expense of $34,705. After full and comprehensive instructions by the learned trial Judge, the jury awarded him damages of $40,000.00.
 
 
 30
 In view of our affirmance of the court below, it is unnecessary to consider the contentions of Appellee, United States Fidelity and Guaranty Company.
 
 
 31
 Affirmed.